[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 5, 2006
THOMAS  K. KAHN
CLERK

No. 05-12938
Non-Argument Calendar

_____

Agency No. A95-897-266

JESUS ANTONIO LLANOS SOTO,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(January 5, 2006)**

Before TJOFLAT, DUBINA and CARNES, Circuit Judges.

PER CURIAM:

Jesus Antonio Llanos Soto ("Llanos"), a native and citizen of Colombia

proceeding <u>pro se</u>, petitions for review of the final order of the Board of

Immigration Appeals, affirming without opinion the immigration judge's denial of

asylum and withholding of removal under the Immigration and Naturalization Act

("INA"), 8 U.S.C. §§ 1158, 1231, and denial of relief under the United Nations

Convention Against Torture ("CAT"), 8 C.F.R. § 208.16(c).[1]  We deny the

petition.

## I.

Llanos contends that the IJ erred in denying his petition and in making an

adverse credibility determination.  He argues that he met his burden of proof for

asylum, for withholding of removal, and for CAT relief by showing that a

paramilitary group, the United Auto-Defense Forces of Columbia ("AUC"),

persecuted him based on his imputed political opinion.  He asserts that the AUC

believed that he supported area guerillas because of his membership in a group that

assisted peasant farmers and because he assisted a friend who was running for

political office in Palmira.  He alleges that the AUC threatened his life on several

occasions.

---

[1] Llanos Soto's wife, Paula Andrea Estrada Goyes, was a rider on his application for asylum, withholding of removal, and CAT relief.  She is not named as a party on the petition for review, but Llanos Soto's brief does mention "his wife."  Appellant's Br. at 10.  The government also refers to them collectively as "petitioners."  Appellee's Br. at 1.  Because Goyes' claims are entirely dependent on Llanos', our discussion of and ruling on Llanos' claims also apply to Goyes' petition.

Llanos testified that his first encounter with the AUC was on March 10, 2000 following a meeting about a project involving fish tanks. Four men in fatigues accosted him and asked for identification. These men requested two million Columbian pesos from him and told him they would contact him later. Llanos did not notify the police because he was afraid that the AUC had infiltrated the government forces. In response to this encounter, Llanos ended his involvement in the fish tank project, and on June 30, 2000, he sold the bicycle business that he owned.

Llanos traveled to the United States several times after this initial encounter with the AUC but did not seek asylum because he did not want to leave his country at that time. Llanos alleges two subsequent encounters with the AUC. On February 25, 2002, a group of men got out of a car and told him that they would be in touch with him later. Then on April 7, 2002, a group of men forced him into a car, blindfolded him, and made him get on the floor of the car. They drove for about an hour into what he perceived to be a mountainous region.

When they arrived at their destination, someone identified himself as the "Chief of the Pacific Zone" and took Llanos' wallet and ID card. The Chief told him that they knew about his involvement with the peasant farmers and that they believed he was linked to the guerillas. He was asked to participate in the

3

paramilitary group and then was taken back to Palmira and was released without being physically harmed.

Llanos told a friend, who was a district attorney, about the incident. This friend told Llanos that he could not offer any protection and that Llanos should make a formal denouncement with the military district. Llanos did not do so because he was afraid that people in the AUC were linked to the armed forces. His district attorney friend did not provide him with any documentation concerning this incident.

Llanos decided to leave Columbia. He came to the United States on April 12, 2002 as a non-immigrant visitor for business and was authorized to stay until July 11, 2002, but he stayed beyond that date. He did not go to the embassy to seek asylum and did not apply for asylum until August 2002. He did not sell his house in Columbia because his mother was still living there. Neither he nor his brother and mother, who still live in Columbia, have had any further contact with the paramilitary group.

After Llanos and his wife had stayed in the United States beyond the authorized time, they were issued Notices to Appear that stated that they were removable. At a hearing before the IJ, they conceded that they were removable and sought asylum, withholding of removal, and CAT relief.

4

The IJ determined that Llanos' testimony was not sufficiently detailed, consistent, or believable to provide a plausible and coherent account of the basis of his fear of persecution. The IJ concluded that the evidence was insufficient to establish Llanos' eligibility for asylum, withholding of removal, or CAT relief. The IJ was particularly concerned about inconsistencies in Llanos' testimony, the information he provided in his asylum application, and his testimony at the asylum interview. For example, Llanos testified that he first encountered the paramilitaries on March 10, 2000, after his meeting about the project involving fish tanks. On his asylum application, however, he stated that the meeting on the fish tank project occurred on March 10, 2000, but his first contact with paramilitaries occurred on April 13, 2000. In his asylum interview, he told the asylum officer that his first contact with paramilitaries occurred on April 3, 2000. These discrepancies led the IJ to make an adverse credibility determination.

The IJ also noted that Llanos' case was not documented in a manner that one might reasonably expect it to be. Llanos made no police reports after the first threat in 2000, and he did not contact the authorities after the incident that occurred on February 25, 2002. He did not make a formal denouncement with the military district as his friend in the district attorney's office told him to do, and he provided no verification or documentation from the district attorney's office.

5

The IJ determined that Llanos' actions did not suggest that he was genuinely fleeing persecution and that his trips to the United States appeared to be designed to establish contacts and to consider whether to relocate on a more permanent basis. The IJ found that although Llanos stated that he collaborated with the Conservative Party and assisted a friend in conducting some vaccination programs, Llanos was not very politically active in Columbia. The IJ also found that although the paramilitaries wanted to recruit Llanos and wanted money from him, that conduct did not rise to the level of persecution. Llanos failed to establish countrywide persecution, according to the IJ, because he spent at least a month in Bogota and nothing happened to him there. Moreover, nothing happened to his family in Palmira even though his mother and brother still live in the area, and his mother still lives in the same house where Llanos formerly resided.

Because Llanos could not satisfy the burden of proof for asylum, the IJ concluded that he could not satisfy the higher standard required for withholding of removal. The IJ also determined that Llanos presented no evidence of past torture or even any past physical harm, that he could relocate to another part of Columbia, and that the paramilitaries were not part of the government of Columbia. Therefore, Llanos had not met the requirements for eligibility for CAT relief.

**II.**

6

The BIA affirmed the IJ's order without opinion. Because the BIA adopted the IJ's opinion, we review the IJ's decision as if it were the BIA's. Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir.2001). We review the IJ's legal determinations de novo. D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 817 (11th Cir. 2004). We examine the IJ's factual findings, including determinations of credibility, under the substantial evidence test. Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1286 (11th Cir. 2005).

Under the substantial evidence test, we will "affirm the IJ's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Id. (citation, quotation marks, and alteration omitted). The substantial evidence test is "deferential" and does not allow us to "re-weigh the evidence from scratch." Mazariegos v. U.S. Att'y Gen., 241 F.3d 1320, 1323 (11th Cir. 2001) (citation and quotation marks omitted). "To reverse the IJ's fact findings, we must find that the record not only supports reversal, but compels it." Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003) (citation omitted). Where the IJ enumerates an applicant's inconsistencies and the record supports these findings, "we will not substitute our judgment for that of the IJ with respect to its credibility findings." D-Muhumed, 388 F.3d at 819.

An adverse credibility determination alone may be fatal to an asylum

7

application if the applicant presents no evidence other than his testimony.  Forgue, 401 F.3d at 1287.  When the IJ has made an adverse credibility determination, the applicant has the burden of showing that "the IJ's credibility decision was not supported by specific, cogent reasons or was not based on substantial evidence."  Id. (citation and quotation marks omitted).

An alien who arrives in or is present in the United States may apply for asylum.  See 8 U.S.C. § 1158(a)(1).  To qualify for asylum, the alien must be a "refugee."  See 8 U.S.C. § 1158(b)(1).  A "refugee" is any person who is unwilling to return to his home country or to avail himself of that country's protection "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion  . . . ." 8 U.S.C. § 1101(a)(42)(A).

The asylum applicant carries the burden of proving statutory "refugee" status.  Al Najjar, 257 F.3d at 1284; 8 C.F.R. § 208.13(a).  The applicant satisfies this burden by showing, with specific and credible evidence: (1) past persecution on account of one of the five categories listed in the statute, or (2) a well-founded fear that future persecution will occur on account of one the statutorily listed

categories.[2]  8 C.F.R. § 208.13(b).  A well-founded fear of persecution may be established based on (1) past persecution, which creates a rebuttable presumption of a well-founded fear; (2) a reasonable possibility of suffering persecution that cannot be avoided by relocating within the subject country; or (3) a pattern or practice in the subject country of persecuting members of a statutorily defined group to which the alien belongs.  See 8 C.F.R § 208.13(b)(1), (2).

The petitioner must establish a causal connection between persecution and a statutorily listed category such as political opinion by "presenting specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution on account of [this political] opinion."  Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1231 (11th Cir. 2005) (citation and quotations omitted) (emphasis in original).  Harassment based on failure to cooperate with an alleged persecutor is not sufficient to show this causal connection.  See Sanchez v. Att'y Gen., 392 F.3d 434, 438 (11th Cir. 2004) (addressing withholding of removal political opinion claim based on FARC's actions against the petitioner).  Although neither the INA nor the regulations define "persecution," we have recognized other circuits' holdings that "persecution is an extreme concept,  requiring more than a few

---

[2] The categories are:  race, religion, nationality, membership in a particular social group, or political opinion.  8 U.S.C. § 1101(a)(42)(A).

9

isolated incidents of verbal harassment or intimidation, and that mere harassment does not amount to persecution." Sepulveda, 401 F.3d at 1231(internal quotations omitted); Gonzales v. Reno, 212 F.3d 1338, 1355 (11th Cir. 2000).

An alien shall not be removed to a country if his life or freedom would be threatened there on account of race, religion, nationality, membership in a particular social group, or political opinion. See 8 U.S.C. § 1231(b)(3)(A). The standard for withholding of removal is more stringent than the well-founded fear standard for asylum. Al Najjar, 257 F.3d at 1292–93. If an applicant is unable to meet the well-founded fear standard for asylum, he generally is unable to qualify for asylum or withholding of removal. Id.

To qualify for CAT relief, the applicant must establish that it is more likely than not that he would be tortured if returned to the proposed country of removal. 8 C.F.R. § 208.16(c)(2); Reyes-Sanchez v. U.S. Att'y Gen., 369 F.3d 1239, 1242 (11th Cir. 2004). The burden of proof for an alien seeking withholding of removal under the CAT, like the burden for an alien seeking withholding of removal under the INA, is higher than the well-founded fear standard for asylum. Al Najjar, 257 F.3d at 1303.

**III.**

Substantial evidence supports the IJ's determination, as adopted by the BIA,

10

that Llanos did not meet the burden of proof for granting of asylum. Llanos failed to demonstrate that he had previously been persecuted or had a well-founded fear of future persecution, and he failed to show a nexus between the AUC's actions toward him, his association with peasant farmers, and his imputed political opinion. The IJ provided specific, cogent reasons for his adverse credibility determination, and the record supports these findings.

Because Llanos cannot satisfy the burden of showing that he has a well-founded fear of persecution that would make him eligible for asylum, he cannot satisfy the more stringent burdens required to establish entitlement to withholding of removal under the INA or under CAT. Al Najjar, 257 F.3d at 1292–93, 1303. Accordingly, we deny Llanos' petition.

**PETITION DENIED.**